2015 IL App (2d) 130451
No. 2-13-0451
Opinion filed March 27, 2015

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Du Page County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 78-CF-317 |
| PHILLIP E. La POINTE, | ) ) | Honorable Robert G. Kleeman, |
| Defendant-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE SCHOSTOK delivered the judgment of the court, with opinion. Justices Zenoff and Burke concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant, Phillip E. La Pointe, appeals a judgment that denied his successive petition for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2012)) against his life sentence for first-degree murder (Ill. Rev. Stat. 1977, ch. 38, ¶ 9-1(a)(1)). On appeal, defendant contends that he proved that Edwin Simpson, the assistant public defender who represented him when he pleaded guilty and was sentenced, was ineffective. We affirm.

¶ 2    On March 7, 1978, defendant, who was 18 years old, shot and killed Peter Moreno, Jr., a taxicab driver. The State charged defendant with (1) first-degree murder based on the intent to kill (first-degree murder) (Ill. Rev. Stat. 1977, ch. 38, ¶ 9-1(a)(1)); (2) felony murder (Ill. Rev.

Stat. 1977, ch. 38, ¶ 9-1(a)(3)); and armed robbery (Ill. Rev. Stat. 1977, ch. 38, ¶ 18-2(a)). Defendant initially pleaded not guilty.

¶ 3    On June 16, 1978, the trial court, Judge Edwin L. Douglas presiding, held a hearing. Simpson stated that, by agreement, defendant wished to withdraw his plea and plead guilty to first-degree murder only, with no agreement on sentencing.  In response to Judge Douglas's questions, defendant stated that he understood the charge and wished to plead guilty to it.

¶ 4    Assistant State's Attorney Thomas Knight then provided the following factual basis.  On the morning of March 7, 1978, defendant visited David Cichelli at the gas station where Cichelli worked and told him that he was going to rob and kill a cab driver.  Defendant showed Cichelli a loaded .22-caliber revolver.  Shortly afterward, defendant left, walked two blocks, and called for a cab.  Moreno arrived, picked up defendant, and drove to the area of York Commons. Defendant shot Moreno twice in the head with the revolver.  He then drove the cab, with Moreno's body inside, a short distance and left it there.  Defendant took some money from Moreno, returned to the gas station, and told Cichelli, " 'Well. I did it.  I killed him.' "  He added that he had killed Moreno because Moreno could identify him.

¶ 5    The factual basis continued as follows.  Later that day, the police found the cab with Moreno lying dead inside.  On March 8, 1978, defendant was arrested and taken to the police station.  He admitted that he had called the cab; that he was in the cab when he heard two shots fired; and that only he and Moreno had been in the cab then.  Defendant said that the gun was now in his home.  The police obtained and executed a search warrant and found the gun.  When defendant shot Moreno, he was not under the influence of drugs or any mental incapacity that negated the intent required for first-degree murder.

¶ 6    The following colloquy then ensued:

"THE COURT: ***

Mr. Lapointe [*sic*], what you have heard the State's Attorney indicate just now, is that substantially the—is that basically correct?

DEFENDANT LAPOINTE: Most of it, yes, sir.

THE COURT: Most of it?

DEFENDANT LAPOINTE: Yeah.

THE COURT: What do you mean by 'most of it'?

MR. SIMPSON: Your Honor, for the purpose of this record, Mr. Lapointe [*sic*], and I as his attorney, will stipulate that were the matter to go to trial, that is the evidence that the State would prove or show if the case were to go to trial."

¶ 7    Judge Douglas further admonished defendant.  After defendant reiterated that his plea was voluntary, the following colloquy occurred:

"THE COURT: Let the record show that the Court further advises you that upon your plea of guilty to the crime of murder, the Court must impose a sentence within the possibilities as follow[s]: At the very least the Court must impose a sentence of a specific number of years of imprisonment, and that number cannot be less than 20.  That specific number of years can be as high as 40 years.

Some examples would be 25 years, 28 years, 37 years or 40 years.  Do you understand this possible sentence?

DEFENDANT LAPOINTE: Yes, I do.

THE COURT: Or the Court may impose a sentence of a specific number of years of imprisonment of not less than 40 nor more than 80 years if you were 17 years or older on the date the crime was committed and either you have previously been convicted

within the last ten years of a felony of an equal or greater class than that to which you are tendering your plea of guilty.

In your case, that could only be a previous murder conviction or if the Court finds that the crime you committed was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty.

Do you understand this possibility?

DEFENDANT LAPOINTE: Yes, I do.

THE COURT: It is also possible for the Court to impose a sentence of imprisonment for the rest of your natural life without parole if the Court finds either that the murder you committed was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty or you were 18 years or older at the time of the crime and the person you murdered was killed during the course of an armed robbery and was actually killed by you and not some other party to the crime or simply as a consequence of that crime, and you killed that person intentionally or with the knowledge that the acts which caused the death, created a strong probability of death or great bodily harm.

Do you understand this possible sentence?

DEFENDANT LAPOINTE: Yes, I do."

¶ 8    Judge Douglas further admonished defendant that he could be sentenced to death if, at the State's request, the court held a hearing in aggravation and mitigation and a jury unanimously found (or, if defendant waived a jury, the judge found) beyond a reasonable doubt that (1) defendant committed the murder during an armed robbery; and (2) no mitigating factors existed that were sufficient to preclude the death penalty.  If the jury (or judge) so found, the court would be required to sentence defendant to death.  Defendant said that he understood.

¶ 9    Next, the judge admonished defendant that, if he were sentenced to prison for less than life, he would, upon his release, have to serve three years of mandatory supervised relief (MSR); if he violated any conditions of his MSR, he could be reincarcerated.  Defendant said that he understood.  He also stated that he had no questions concerning the possible sentences and that he still wished to plead guilty to first-degree murder.  The judge then found that defendant had voluntarily pleaded guilty and that there was a factual basis for the plea.

¶ 10    Simpson briefly questioned defendant.  In response, defendant stated that the State had given Simpson information that Simpson had then discussed with defendant; that Simpson's investigator had obtained other information, which Simpson had also shared with defendant; and that Simpson had not threatened or coerced him into pleading guilty.

¶ 11    We must now note that, effective February 1, 1978, Public Act 80-1099, § 3, amended section 3-6-3 of the Unified Code of Corrections (Code) (Ill. Rev. Stat. 1977, ch. 38, ¶ 1003-6-3) to provide as follows (additions are italicized, and deletions are noted by strikeouts, as in the original act):

"§ 3-6-3.  Rules and Regulations for *Early Release* ~~Diminution of Sentence~~.) [*sic*] (a)*(1)* The Department of Corrections shall prescribe rules and regulations for the *early release* ~~diminution of sentences~~ on account of good conduct ~~or meritorious service~~ of persons committed to the Department *which shall be subject to review by the Prisoner Review Board.*

*(2) Such rules and regulations shall provide that the prisoner shall receive one day of good conduct credit for each day of service in prison for all classes of felonies other than where a sentence of 'natural life' has been imposed.  Each day of good conduct credit shall reduce by one day the inmate's period of incarceration set by the*

*court.* ~~The maximum sentence shall not be diminished, except with the approval of the Director of the Department of Corrections.~~

*(3) Such rules and regulations shall also provide that the Director may award up to 90 days additional good conduct credit for meritorious service in specific instances as the Director deems proper.*

(b) Whenever a person is or has been committed under separate convictions, with separate sentences, such sentences shall be construed under Section 5-8-4 [of the Code (Ill. Rev. Stat. 1977, ch. 38, ¶ 1005-8-4)] in granting and forfeiting of good time.

(c) The Department shall prescribe rules and regulations for revoking good *conduct credit* ~~time~~, *or suspending or reducing the rate of accumulation thereof for specific rule violations*, during imprisonment ~~or release on parole or mandatory release under supervision~~. *Such rules and regulations shall provide that:*

*(1) good conduct credits previously earned shall accumulate on a monthly basis.*

*(2) no inmate may be penalized more than one year of good conduct credit for any one infraction.*

*When the Department seeks to revoke, suspend or reduce the rate of accumulation of any good conduct credits for an alleged infraction of its rules, it shall bring charges therefor against the prisoner sought to be so deprived of good conduct credits before the Prisoner Review Board \*\*\* if the amount of credit at issue exceeds 30 days or when during any 12[-]month period, the cumulative amount of credit revoked exceeds 30 days. However, the Board shall not be empowered to review the Department's decision with respect to the loss of 30 days of good conduct credit within any calendar year for any prisoner or to increase any penalty beyond the length requested by the Department.*

*(3) The Director of the Department of Corrections, in appropriate cases, may restore up to 30 days good conduct credits which have been revoked, suspended or reduced. Any restoration of good conduct credits in excess of 30 days shall be subject to review by the Prisoner Review Board. However, the Board may not restore good conduct credit in excess of the amount requested by the Director.*

*(4) Nothing contained in this Section shall prohibit the Prisoner Review Board from ordering \*\*\* that a prisoner serve up to one year of the sentence imposed by the court which was not served due to the accumulation of good conduct credit.*" Pub. Act 80-1099, § 3 (eff. Feb. 1, 1978).

¶ 12 The judge did not admonish defendant that he would be eligible for good-conduct credit against a sentence of less than natural life. At the guilty-plea hearing, the subject of good-conduct credit was never raised on the record.

¶ 13 The court ordered a presentence investigation report (PSIR). On August 31, 1978, the court held a sentencing hearing. We note the following.

¶ 14 Cichelli testified consistently with the factual basis about his encounters with defendant; he added that defendant said that he had shot Moreno for the money but that it was not worth it. Elmhurst police sergeant James Altman testified that, when he examined the abandoned taxicab, he saw that Moreno's pockets had been turned inside-out and there was no money or identification on him. Sergeant Ralph O'Connell, who had supervised the evidence work in the investigation, testified that Moreno had been shot twice, in the head and the neck, from behind at close range. Deputy sheriff David Leeberg testified that he had been assigned to the Du Page County jail as a supervisor. Late in March and early in April 1978, he saw defendant roughly 10

times wearing a T-shirt with the inscription " 'Elmhurst Executioner.' " Two other deputy sheriffs who worked at the jail testified that they saw defendant wearing the same T-shirt.

¶ 15   Joseph Ray, a 16-year-old student, testified that, two or three weeks before defendant was arrested, he asked Ray to help him rob the cash register at a drugstore restaurant. Before then, they had burglarized a home. According to the PSIR, defendant was on probation for burglary when he murdered Moreno. Ray also testified that defendant had telephoned him from jail and asked him to get him some "hash," but that Ray refused.

¶ 16   In mitigation, defendant's mother and stepfather testified that defendant had a serious drug problem. A minister testified that he had tried to work with defendant on his drug problem, but he believed that defendant was dangerous to himself and society and needed psychiatric care.

¶ 17   In argument, Knight requested that defendant be sentenced to life. Knight claimed two bases for a life term. First, defendant's crime was accompanied by exceptionally brutal or heinous conduct, indicative of wanton cruelty (see Ill. Rev. Stat., 1978 Supp., ch. 38, ¶ 1005-8-1(a)(1)): it was premeditated and unprovoked, and defendant boasted about it afterward. Second, defendant committed the murder in the course of committing armed robbery (see Ill. Rev. Stat., 1978 Supp., ch. 38, ¶¶ 1005-8-1(a)(1), 9-1(b)(6)). Simpson argued that defendant's youth and rehabilitative potential made a life term excessive. The cause was continued for sentencing.

¶ 18   On September 18, 1978, Judge Douglas pronounced sentence, explaining his decision as follows. Shortly before defendant murdered Moreno, he told Cichelli what he was going to do; shortly afterward, he told Cichelli that he had done it. Defendant's conduct showed "premeditation and a calculated deliberateness." No statutory factors in mitigation (see Ill. Rev. Stat., 1978 Supp., ch. 38, ¶ 1005-5-3.1) applied. Turning to the aggravating factors listed in the first-degree murder statute, the existence of one or more of which would have authorized a death

sentence (see Ill. Rev. Stat., 1978 Supp., ch. 38, ¶ 9-1(b)), Judge Douglas found inapplicable the first five. He turned to the sixth factor, which read:

"6. [T]he murdered individual was killed in the course of another felony if:

(a) the murdered individual was actually killed by the defendant and not by another party to the crime or simply as a consequence of the crime; and

(b) the defendant killed the murdered individual intentionally or with the knowledge that the acts which caused the death created a strong probability of death or great bodily harm to the murdered individual or another; and

(c) the other felony was one of the following: armed robbery, robbery, rape, deviate sexual assault, aggravated kidnapping, forcible detention, arson, burglary, or the taking of indecent liberties with a child[.]" Ill. Rev. Stat., 1978 Supp., ch. 38, ¶ 9-1(b)(6).

¶ 19    Of this factor, Judge Douglas stated as follows:

" 'The murdered individual was killed in the course of another felony,' which was not [*sic*] true here.

'The murdered individual was actually killed by the defendant and not by another party to the crime or simply as a consequence of the crime,' which is not [*sic*] true here.

'The defendant killed the murdered individual intentionally or with the knowledge that the acts which caused the death created a strong possibility [*sic*] of death or great bodily harm to the murdered individual or another,' and that was true here.

And the felony, of course, was armed robbery."

¶ 20    The judge again stated that no mitigating factors applied. He continued as follows:

"So, the Court, in taking into consideration the heinous nature of this crime, its brutality, its cold, calculating, cold-blooded act which is indicative of the wanton cruelty,

there was indication it was premeditated and post meditated [*sic*], *** it shall be the judgement [*sic*] of this court that the defendant *** shall serve a life sentence, without parole."

¶ 21 Judge Douglas's statement invoked section 5-8-1(a)(1) of the Code (Ill. Rev. Stat., 1978 Supp., ch. 38, ¶ 1005-8-1(a)(1)), which was added by the public act that also created the day-for-day credit system in section 3-6-3(a). Pub. Act 80-1099, § 3 (eff. Feb. 1, 1978). Section 5-8-1(a)(1) read:

"[I]f the court finds that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty or that any of the aggravating factors listed in subsection (b) of Section 9-1 of the Criminal Code of 1961 [(Ill. Rev. Stat. 1978 Supp., ch. 38, ¶ 9-1(b))] are present, the court may sentence the defendant to a term of natural life imprisonment[.]" Ill. Rev. Stat., 1978 Supp., ch. 38, ¶ 1005-8-1(a)(1).

¶ 22 The judge admonished defendant of his appeal rights, stating in part, "Prior to taking an appeal, you must file, within 30 days, a written motion to have the judgment entered against you vacated and to withdraw your plea of guilty." He continued, "The motion must state the grounds for vacating the judgment," and "[a]ny issue or claim of error not raised in your motion shall be deemed waived on appeal."

¶ 23 Immediately after the judge finished the admonishments, Simpson stated, "Your Honor, I would ask that yourdirect [*sic*] the Clerk of the Court to prepare a notice of appeal" on defendant's behalf. No notice of appeal was filed that day. On September 25, 1978, however, the public defender, Frank Wesolowski, Jr., signed and filed a notice of appeal. As of then, no postjudgment motion had been filed on defendant's behalf.

¶ 24    On October 4, 1978, Simpson filed a motion to reconsider defendant's sentence.    It argued in general terms that the sentence was excessive.    On October 10, 1978, the trial court struck the motion.    On October 17, 1978, Simpson filed an amended motion to reconsider the sentence.    On October 30, 1978, the trial court ruled that it had no jurisdiction to hear the amended motion, given the pending appeal.    On November 1, 1978, Robert Heise, the appellate division chief of the Du Page County public defender's office, signed and filed a notice of appeal.

¶ 25    This court heard defendant's direct appeal.    He argued that his life sentence was excessive.    Before deciding the issue, we noted that defendant had failed to move to withdraw his plea and vacate the judgment, as then required by Illinois Supreme Court Rule 604(d) (eff. Jan. 1, 1970).    Based on this omission, the State argued that defendant had forfeited his argument on appeal.    *People v. LaPointe*, 85 Ill. App. 3d 215, 219 (1980), *rev'd*, 88 Ill. 2d 482 (1981).    This court disregarded the forfeiture, reasoning that Simpson's decision to file the notice of appeal without having filed the required motion amounted to ineffective assistance, especially as Simpson had heard the judge admonish defendant that he could not preserve any issues on appeal unless he timely moved to withdraw his plea and vacate the judgment.    *Id.*

¶ 26    Turning to the merits, we held that the trial court had erred in applying the factors in aggravation and mitigation.    *Id.* at 221-23.    In part, we held that the court had incorrectly found that defendant's conduct had been exceptionally brutal or heinous, given his poor mental health and his drug abuse.    *Id.*    Thus, we reduced his prison sentence from life to 60 years.    *Id.* at 224.

¶ 27    The supreme court reversed this court and affirmed the trial court, holding that the trial court had properly considered all of the pertinent sentencing factors.    *People v. La Pointe*, 88 Ill. 2d 482, 493 (1981).    Further, the trial court had properly found that defendant's conduct had

been exceptionally brutal or heinous: defendant, who had had a history of criminal activity, "acted with premeditated, cold-blooded deliberation" and committed a crime for which he could have been sentenced to death. *Id.* at 501. Moreover, he displayed a callous and unremorseful attitude by wearing the " 'Elmhurst Executioner' " T-shirt in jail. *Id.*

¶ 28 After exhausting his direct appeals, defendant filed numerous postconviction actions in both Illinois and federal courts. We recount the ones filed specifically under the Act to the extent necessary to explain our decision here.

¶ 29 On May 1, 2002, defendant filed his first petition under the Act, asserting numerous claims. Three are pertinent here. The first was that Simpson had rendered ineffective assistance on the matter of good-conduct credit. This claim alleged as follows. Simpson presented defendant with an offer from the State under which, in exchange for his plea of guilty to first-degree murder, it would drop the other two charges and recommend a 40-year prison term. However, Simpson never informed defendant of the recent amendment to the Code that allowed day-for-day good-conduct credit. Defendant rejected the proposed bargain, telling Simpson, " 'I couldn't accept that because I'll be 58 when I get out,' " thus showing that he was unaware of the good-conduct-credit provision. Simpson should have known about the provision and should have told defendant about it; had he done so, defendant would have accepted the State's offer and would have completed his sentence already.

¶ 30 The second claim pertinent here was that Simpson had been ineffective because, at the guilty-plea hearing, he failed to explain to defendant the "brutal or heinous" sentencing provision, other than assuring him that it did not apply to him. The third claim was that appellate counsel had been ineffective for failing to argue that Simpson had rendered ineffective assistance by failing to file the required postjudgment motion.

¶ 31    Attached to defendant's petition was a copy of a letter, dated September 23, 1978, that defendant had written to Simpson from prison.  The letter read:

"As you probably know I was transfered [*sic*] down here to Joliet right after the sentencing.  What happened in our sentencing hearing?  When we talked back in I think June at the plea hearing you specifically told me 'because the state couldn't or didn't have any evidence or facts of brutal or heinous that the judge couldn't go outside the 20-40 range.'  So what in the heck happened and why am I hear [*sic*] with a life sentence?  To another issue[,] when I got here a captain tuttle [*sic*] checked me in and said something about how I won't be getting any good time, I asked around about what is good time.  I found out you get days for everyday [*sic*] your [*sic*] here which means you only serve half your sentence.  Why didn't you tell me about that?  When you told me the state had offered a 40[-]year sentence I thought I'd be 58 when I got out, if you had told me about this good time stuff I would of [*sic*] taken that deal.  Can we still get it?  The judge said something about taking back my guilty plea within 30 days, lets [*sic*] do that.  You can let him know how you didn't tell me about this good time stuff and that I'll take that deal, please let me know what happens next."

¶ 32    The trial court summarily dismissed the petition.  This court affirmed.  *People v. LaPointe*, No. 2-02-0702 (2003) (unpublished order under Supreme Court Rule 23).

¶ 33    On January 10, 2008, defendant moved *pro se* for leave to file a successive petition under the Act.  See 725 ILCS 5/122-1(f) (West 2008).  As pertinent here, the motion contended that defendant's September 23, 1978, letter to Simpson evinced that defendant had not wanted to appeal directly from the judgment without filing the required motion—yet Simpson had done

just that, without consulting him. Defendant contended that Simpson's blunder had denied him the opportunity to challenge the judgment—and thus his life sentence.

¶ 34 The trial court denied defendant leave to file the proposed successive petition. We affirmed. *People v. LaPointe*, No. 2-08-0236 (2010) (unpublished order under Supreme Court Rule 23). On appeal, the supreme court directed us to vacate our judgment and to remand the cause to the trial court to allow defendant to file a successive petition limited to "the issue of whether trial counsel was ineffective in failing to file a motion to withdraw defendant's guilty plea on the grounds stated in defendant's alleged September 28, 1978[,] letter to counsel." *People v. LaPointe*, No. 111395 (Jan. 26, 2011).

¶ 35 On remand, defendant filed a *pro se* petition. The trial court allowed the petition to progress to the next stage and appointed counsel for defendant (see 725 ILCS 5/122-2.1(b) (West 2010)). On May 1, 2012, defendant, by counsel, filed an amended petition that summarized the history of the case and attached (1) a copy of an affidavit, dated October 30, 1998, that Simpson had completed in an unsuccessful federal action that defendant had filed; (2) defendant's affidavit; and (3) a copy of defendant's September 28, 1978, letter to Simpson.

¶ 36 The amended petition alleged that Simpson had rendered ineffective assistance in three respects. First, Simpson incorrectly told defendant that the " 'facts' " of the case were not exceptionally brutal or heinous. As a result, defendant did not believe that the judge could sentence him to more than 40 years and, therefore, he rejected the State's offer. Second, Simpson failed to inform defendant that a "direct consequenc[e]" of accepting the offer would be that, under the recently amended section 3-6-3(a) of the Code, day-for-day good-conduct credit would "automatically attach[ ]," so as to reduce defendant's actual time in prison to 20 years.

¶ 37    Third, immediately after the judge pronounced the sentence, and without consulting defendant, Simpson told the judge that he wanted a notice of appeal filed. The notice of appeal was filed without Simpson having filed the necessary Rule 604(d) motion. Defendant timely wrote to Simpson (the September 23, 1978, letter), asking him to move to withdraw defendant's guilty plea, but Simpson never did so; instead, without consulting defendant, he filed improper motions to reconsider the sentence, and he failed to move per Illinois Supreme Court Rule 309 (eff. Jan. 1, 1967) to withdraw the notice of appeal. As a result, the trial court refused to hear the motions, citing a lack of jurisdiction.

¶ 38    In his 1998 affidavit, Simpson stated as follows. Late in May or early in June 1978, the State proposed an agreement under which defendant would plead guilty to first-degree murder and the State would dismiss the felony-murder and armed-robbery charges and recommend a sentence of 40 years' imprisonment. Defendant rejected the offer and later elected to plead guilty to first-degree murder, with no agreement on the sentence. Only during the closing arguments at the sentencing hearing did Simpson learn that the State was seeking a sentence of life without parole.

¶ 39    In his affidavit, defendant stated as follows. Late in May or early in June 1978, Simpson presented the plea offer. He also told defendant that "the judge wouldn't be able to go over the 40 years as the facts were not exceptionally brutal and [*sic*] heinous indicative of wanton cruelty." Simpson advised defendant to accept the deal. Simpson also told defendant's parents about the offer; they consulted an attorney who recommended that defendant accept it. However, defendant declined the offer, because "(A) If 40 years was the most the judge could give [defendant], why accept the maximum? (B) At 18 [defendant] would be 58 years old when

[he] got out. [Defendant] could not imagine doing 40 straight years." At no time did Simpson tell defendant that "day for day good time was available which would cut the sentence in half."

¶ 40    Defendant's affidavit continued as follows. In his admonishments, Judge Douglas mentioned possible prison sentences longer than 40 years, but he spoke of these hypothetically, and Simpson had just told defendant that a sentence of more than 40 years was impossible. When Judge Douglas asked defendant what he meant by saying that " 'most of' " the factual basis was true, Simpson pulled defendant aside before he could answer and told him that the judge could not give him more than 40 years, because nothing in the factual basis supported a finding of exceptionally brutal or heinous conduct. After he was sentenced, defendant was hurried out of the courtroom and had no opportunity to talk to Simpson. Only in prison did he learn of the good-conduct-credit provision in the Code. Defendant wrote Simpson on September 23, 1978, but he never heard back about his request to withdraw his plea. Defendant would have accepted the State's offer if either (1) Simpson had explained to him that he could receive more than 40 years; or (2) Simpson had "explained the concept of good time."

¶ 41    Defendant's petition argued that Simpson had rendered ineffective assistance for the following reasons. Simpson performed deficiently in failing to file the required postjudgment motion. Moreover, even after he filed the notice of appeal, Simpson could have moved per Rule 309 to withdraw it and thus enable the trial court to hear a proper motion. There was no justification for Simpson's failure to preserve any challenge to the judgment. Simpson also performed deficiently in (1) incorrectly advising defendant that the factual basis for the plea precluded a sentence of more than 40 years; and (2) failing to advise defendant that, if he accepted the 40-year offer, he would be eligible for day-for-day good-conduct credit. Had

Simpson informed defendant properly, defendant would have accepted the State's offer instead of proceeding as he did and ending up with a life sentence.

¶ 42 Defendant filed a second amended petition that added a discussion of the recent Supreme Court case of *Missouri v. Frye*, 566 U.S. __, 132 S. Ct. 1399 (2012), relating to ineffective-assistance claims based on guilty-plea negotiations. The second amended petition also included an affidavit from defendant's mother. In the affidavit, she stated that, before defendant decided to plead guilty, Simpson told her about the State's plea offer but never mentioned the concept of day-for-day good-conduct credit against the proposed 40-year sentence. She also stated that defendant told her that he rejected the offer because he did not want to spend 40 years in prison.

¶ 43 The State moved to dismiss the second amended petition. The State contended first that defendant could not establish that Simpson was ineffective for failing to advise him that he would be eligible for day-for-day good-conduct credit if he accepted the State's offer. The State cited *People v. Frison*, 365 Ill. App. 3d 932 (2006), which held that, because possible day-for-day good-conduct credit is a collateral consequence of a guilty plea, not a direct one, counsel's failure to disclose it to a defendant will not support a claim of ineffectiveness.

¶ 44 The State contended second that defendant had not sufficiently documented his claims of error. First, he had not alleged any facts to prove that Simpson did not inform him of the possible good-conduct credit. Second, he had not alleged any specific facts to prove that Simpson ever received the letter dated September 23, 1978, or that he had otherwise been placed on notice that defendant wished to move to withdraw the guilty plea.

¶ 45 The State also contended that *Frye* and *People v. Curry*, 178 Ill. 2d 509 (1997), were distinguishable. *Frye* held only that the defendant's attorney had been ineffective for completely failing to communicate a plea offer, not merely omitting a detail of an offer involving a collateral

consequence. *Curry* was distinguishable because there the defendant's attorney failed to advise him that, if he rejected an offer to plead guilty to one charge, with the other two charges dismissed, and instead went to trial on all three charges, he would face mandatory consecutive sentences. The State reasoned that mandatory consecutive sentences are a direct consequence of a plea, but that possible good-conduct credit is merely a collateral consequence.

¶ 46 After hearing arguments on the State's motion to dismiss, the trial court granted the motion in part. It dismissed defendant's claim of ineffectiveness insofar as it was based on Simpson's alleged failure to inform defendant about the day-for-day good-conduct credit that was possible against the proposed 40-year sentence. The court did not dismiss the claim based on Simpson's allegedly ineffective handling of a possible extended-term sentence. The judge explained as follows. Courts had repeatedly held that good-conduct credit is a collateral consequence of a guilty plea. In *Padilla v. Kentucky*, 559 U.S. 356 (2010), the Supreme Court rejected the direct/collateral test in the context of deportation, explaining that the proper measure is " 'prevailing professional norms.' " *Id.* at 366 (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)). By this standard, it was unprofessional for Simpson to present defendant with the State's offer of a 40-year sentence but fail to tell him about the good-conduct credit. Moreover, defendant had alleged that he would have accepted the offer had he known of the credit. However, the judge noted, in *People v. Hughes*, 2011 IL App (2d) 090992, *aff'd*, 2012 IL 112817, this court concluded that, outside the deportation context, *Padilla* had not upset the direct/collateral distinction. Thus, as any good-conduct credit is a collateral consequence of a guilty plea, Simpson was not ineffective for failing to tell defendant about it.

¶ 47 The judge explained that he declined to dismiss defendant's claim that Simpson was ineffective for assuring him that, because the factual basis could not support a "brutal or

heinous" finding, Judge Douglas could not impose an extended-term sentence. The judge reasoned that, although Judge Douglas did admonish defendant about the possibility of an extended-term sentence, defendant's allegation that Simpson privately assured him that this was really not possible would be sufficient to show that Simpson had been ineffective. It was at least possible that Simpson had not merely given bad advice but had misstated the law.

¶ 48 The cause proceeded to an evidentiary hearing (see 725 ILCS 5/122-6 (West 2012)). We summarize the evidence.

¶ 49 Defendant called Simpson. On direct examination, he testified as follows. After the preliminary hearing, he started representing defendant. Assistant State's Attorney Michael Higgins conveyed an offer under which defendant would plead guilty to first-degree murder and the State would recommend a 40-year prison sentence. Day-for-day good-conduct credit would have applied under the new statute. Simpson conveyed the offer to defendant. They discussed the offer and, at some point, also discussed possible extended-term sentences.

¶ 50 Asked whether he had told defendant that day-for-day credit would apply, Simpson testified, "I can't tell you I can remember that." He added that he "would presume that [he] probably told [defendant] that there would be some kind of day-for-day credit." Simpson also testified that defendant's parents had hired Robert Greenwalt, a private attorney; Simpson "presume[d]" that Greenwalt had told them and defendant that day-for-day credit would apply. Simpson advised defendant to accept the offer. Defendant told Simpson that he did not wish to accept it.

¶ 51 Asked what he had advised defendant about the "brutal or heinous" factor, Simpson testified, "My recollection is, I told Mr. LaPointe [*sic*], in my opinion, what he did was not—did not qualify as brutal and [*sic*] heinous." Asked whether, before defendant entered his open plea,

he had ever advised defendant that a life sentence was possible, Simpson testified, "I can't say that I really did advise him that he could get a natural life sentence." Before the sentencing hearing, Simpson had not realized that the State would be seeking a life sentence; nobody from the State had discussed this possibility with him. Simpson recalled that Judge Douglas eventually used the factual basis that the State had introduced at the guilty-plea hearing as a basis for defendant's life sentence. Judge Douglas relied on a "brutal or heinous" finding to impose the life term.

¶ 52 Simpson conceded that, on his initiative, a notice of appeal was filed before he had consulted with defendant about any issues that he might have for a postjudgment motion. Simpson admitted receiving defendant's September 23, 1978, letter. After he received it, he did not communicate with defendant but filed a motion to reconsider the sentence and an amended motion to reconsider the sentence. He did not file any motion to withdraw defendant's guilty plea even though defendant's letter asked whether he could take back his plea. Later, Simpson learned that Judge Douglas had refused to hear the motions, because the notice of appeal had divested the trial court of jurisdiction. Simpson never attempted to vacate or dismiss the notice of appeal.

¶ 53 Simpson testified on cross-examination that, after he started representing defendant, defendant's family hired Greenwalt. Simpson did not know what Greenwalt had told defendant and his family. Judge Douglas's admonishments at the guilty-plea hearing included a list of the possible penalties, including that the death penalty would be available upon proof that defendant murdered Moreno during an armed robbery.

¶ 54 Simpson acknowledged that, in the September 23, 1978, letter, defendant asked how he could have received life imprisonment after Simpson had assured him that the murder was not

exceptionally brutal or heinous. Simpson testified, "That was my opinion, sir. Still is my opinion." In 1978, the day-for-day-credit provision was new, and "[w]e had not a lot of knowledge about the day-for-day good time." Attorneys at the time "understood [that] much of day-for-day good time was within the discretion of a warden at a penitentiary."

¶ 55    On redirect examination, defendant's attorney asked Simpson whether, before defendant pleaded guilty, he advised defendant that "[he] did not believe the evidence or the facts would permit a Judge to find [the crime] exceptionally brutal and heinous." Simpson answered, "Correct." He was sure that defendant had relied on his advice. Asked whether he had ever advised defendant that he would be entitled to day-for-day credit against the proposed 40-year sentence, Simpson testified, "I don't recall"; it was possible that he had not.

¶ 56    On re-cross-examination, the State asked Simpson, "You advised [defendant] to take a 40-year offer when you believed that was pretty much close to the maximum?" Simpson said yes. On surredirect examination, Simpson explained why he did not consider defendant's murder of Moreno to have been exceptionally brutal or heinous as the Code defines that concept. He stated, "In my opinion, if a person is shot quickly twice in the back of the head and they are dead as a result of that, this is a very short time without suffering greatly." He added, "That's why I told [defendant] I did not consider it a brutal and heinous crime." On surrecross-examination, the State again asked Simpson whether he had advised defendant of the "whole range of possibilities" for sentencing if he pleaded guilty. Simpson answered, "I think I explained to him, in my opinion, it was not a brutal and heinous crime." He added that Judge Douglas did admonish defendant that a "brutal or heinous" finding could lead to a life sentence.

¶ 57    Defendant then testified on direct examination as follows. After Simpson started representing him, they went over the possible sentences. The examination continued:

"Q. Do you recall what those possible penalties were that Mr. Simpson informed you of?

A. Yes. He told me, upon a finding of guilty, that I would be subject to a 20- to 40-year sentence. He went to the extended term section, and he said that because I didn't have a same or greater class felony, I would not be eligible for that. And that my crime was not brutal and heinous. So, I couldn't be given an extended term based on that.

Q. At any time did Mr. Simpson inform you about the possibility of being—being subject to a possible life sentence?

A. He said the only possibility of a life sentence was if the State [*sic*] found me guilty of the murder committed in the course of an armed robbery.

Q. And you recall any discussions Mr. Simpson had regarding the term [']exceptionally brutal or heinous[']?

A. He did not say that was a possibility because my case wasn't.

Q. Specifically, what did he tell you about—do you recall what he told you about brutal and heinous in terms of facts related to your case?

A. He didn't say what was or what wasn't brutal and heinous. He said my facts weren't brutal and heinous."

¶ 58    Defendant testified that Simpson advised him to take the State's offer. Defendant declined, because "if 40 was the most I could get, excluding the armed robbery, I wasn't going to accept the maximum." Asked whether Simpson told him whether he would serve all 40 years or "part of the 40," defendant responded, "He never mentioned anything concerning partly or all of it or anything like that. It was just I was under the impression I would have to serve all of it. I didn't know anything about percentages or anything like that. He did not advise me about the

percentages of it." Defendant eventually accepted an agreement under which the State dropped the felony-murder and armed-robbery charges and he pleaded guilty to first-degree murder, with no agreement on the sentence.

¶ 59 Defendant recounted that he told Judge Douglas that he agreed with " '[m]ost of' " the factual basis. The judge asked him what he meant. Simpson pulled him aside and told him that "there was nothing exceptionally brutal and heinous in the factual basis. The Judge would be constrained to a 20 to 40, and [defendant] should keep [his] answer simple." Judge Douglas admonished defendant that a life sentence was possible, but defendant "didn't really believe it because of what Mr. Simpson had told [him]."

¶ 60 Defendant stated that he entered the plea that he did because Simpson had advised him that he could not receive more than 40 years. He rejected the earlier plea offer for the same reason. Before the sentencing hearing, defendant and Simpson had had "no clue" that the State would ask the judge to sentence him to life.

¶ 61 Defendant testified that, when Simpson asked Judge Douglas to direct the circuit court clerk to file a notice of appeal, he had not consulted defendant about this matter. After defendant was sentenced, he did not communicate verbally with Simpson. He wrote him five days later, asking him to move to withdraw the guilty plea, but Simpson never did so. Simpson did file motions to reconsider the sentence but did not include any of the issues raised in defendant's letter.

¶ 62 Defendant testified on cross-examination as follows. Judge Douglas did admonish him about the possible sentences of death and life imprisonment, and defendant told the judge that he understood. Defendant persisted in his guilty plea because he was "still under the impression

from Simpson that those weren't real possibilities." Greenwalt never talked to defendant about the offer and never advised him on whether to accept it.

¶ 63    On redirect examination, defendant stated that, when Simpson pulled him aside at the guilty-plea hearing, he assured him that "[t]he Judge would be constrained to 20 to 40 because the State had not alleged anything exceptionally brutal and heinous." Based on that assurance, defendant persisted in his plea, believing that "20 to 40 was the maximum. No matter what the Judge was admonishing me about, that was [defendant's] belief." At no time before or after he pleaded guilty did Simpson tell him that he was subject to a life sentence.

¶ 64    Defendant rested. The State presented no evidence. After arguments, the trial judge initially clarified that the issue of day-for-day good-conduct credit had been settled at the second stage of the proceedings; as a matter of law, Simpson's omissions about a collateral consequence of a guilty plea could not constitute ineffectiveness. Thus, the only issue was Simpson's alleged ineffectiveness on the "brutal or heinous" issue. Although Simpson's failure to file the required motion to withdraw the guilty plea was inexcusable, it was not a separate ground for relief at this point: the successive petition that defendant filed on remand from this court was, in essence, the motion to withdraw the plea that Simpson should have filed originally.

¶ 65    The judge turned to Simpson's handling of the "brutal or heinous" factor. To prove ineffective assistance, defendant had to establish that counsel's performance was objectively unreasonable and that defendant was prejudiced as a result. *Strickland*, 466 U.S. at 687-88; *Curry*, 178 Ill. 2d at 518-19. The judge distinguished between an attorney's erroneous opinion or prediction, on the one hand, and his mistake of law, on the other. He concluded that Simpson's statement to defendant—"these facts aren't brutal and heinous, this is how I view it"—fell into the first category. It was "a factual piece of advice." The judge credited Simpson's

testimony "that he told the defendant. In my opinion it's not brutal and heinous." Simpson could not have presented an offer for a 40-year prison sentence while also telling defendant flatly that he could not get more than 40 years. Simpson had reasonably, although erroneously, characterized "two shots in the back of the head" as falling short of exceptionally brutal or heinous. That Judge Douglas later found differently did not prove that Simpson's advice had been objectively unreasonable.

¶ 66    The trial court denied defendant's petition. He timely appealed.

¶ 67    On appeal, defendant contends that the trial court erred in denying his petition, because he proved that Simpson had rendered ineffective assistance in two respects: (1) failing to advise defendant that, if he accepted the State's plea offer, he would be eligible for day-for-day good-conduct credit against the proposed 40-year sentence; and (2) erroneously advising defendant that the absence of any evidence that his offense was accompanied by exceptionally brutal or heinous conduct meant that he could not be sentenced to more than 40 years for first-degree murder. Defendant also asserts that Simpson was ineffective for failing to file the required postjudgment motion, by which defendant could have raised these issues without needing a postconviction proceeding. We do not consider this argument separately, as in itself it would not establish a ground for relief. We assume that Simpson's failure to file the required motion fell below an objective standard of reasonable performance, but we note that defendant does not contend that this lapse in itself caused prejudice so as to support a claim of ineffectiveness.

¶ 68    Defendant argues that he suffered prejudice from either one of Simpson's two allegedly unprofessional lapses. Specifically, he maintains that, absent either Simpson's omission of advice about good-conduct credit or his erroneous assurance that an extended term could not be imposed, defendant would have accepted the State's initial offer and avoided the life sentence

that he is now serving.  For the following reasons, we disagree with defendant on the performance prong of each claim, and we affirm without considering prejudice.

¶ 69    The trial court dismissed one of defendant's claims (day-for-day good-conduct credit) at the second stage, based on the State's motion to dismiss.  Our review of this ruling is *de novo*, and we ask whether, taking the factual allegations of the claim as true, it makes a substantial showing of a constitutional violation.  See *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006).  The trial court denied defendant's other claim (extended-term sentence) after an evidentiary hearing, so we defer to the trial court's factual findings and may reverse only if the judgment is manifestly erroneous.  See *People v. Morgan*, 212 Ill. 2d 148, 155 (2004).

¶ 70    We set out the basic principles applicable to both claims.  To show that trial counsel was ineffective, a defendant must prove that counsel's performance was objectively unreasonable and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  *Strickland*, 466 U.S. at 694; *Hughes*, 2012 IL 112817, ¶ 44.  Counsel's performance must not be viewed in hindsight.  *People v. Fuller*, 205 Ill. 2d 308, 331 (2002).  A defendant must overcome the strong presumption that counsel's conduct falls within the wide range of reasonable assistance.  *Strickland*, 466 U.S. at 689; *People v. Perez*, 2012 IL App (2d) 100865, ¶ 65.

¶ 71    The constitutional right to the effective assistance of counsel extends to the negotiation and consideration of plea offers that lapse or are rejected.  *Frye*, 566 U.S. at ___, 132 S. Ct. at 1409; *People v. Hale*, 2013 IL 113140, ¶¶ 19-20.  To show prejudice in this type of situation, a defendant must demonstrate a reasonable probability that (1) he would have accepted the earlier plea offer had he received the effective assistance of counsel; and (2) the plea would have been entered without the prosecution canceling it or the trial court refusing to accept it, if they had the

authority to exercise that discretion under state law. *Frye*, 566 U.S. at ___, 132 S. Ct. at 1409; *Hale*, 2013 IL 113140, ¶¶ 19-20. More generally, the defendant must show a reasonable probability that the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time. *Frye*, 566 U.S. at ___, 132 S. Ct. at 1409.

¶ 72    We turn to the first claim of ineffective assistance. Defendant contends that the trial court erred in holding, as a matter of law, that Simpson could not have been ineffective for failing to inform him that, if he accepted the State's plea offer, he would, under the newly adopted section 3-6-3(a) of the Code, be entitled to day-for-day good-conduct credit against the 40-year prison term. Defendant argues that the trial court erred in holding that the claim failed as a matter of law because good-conduct credit is a collateral consequence of a guilty plea. Defendant acknowledges that we so held in *Frison*, but he contends that *Frison*'s reliance on the direct/collateral distinction is now invalid because *Padilla* established a more open-ended test based on the significance of the allegedly collateral matter in light of professional standards.

¶ 73    We affirm the trial court's judgment on the good-conduct-credit claim. Despite *Padilla*, the collateral-consequence doctrine applies to defendant's claim.

¶ 74    Before *Padilla*, Illinois courts adhered to a strict distinction between "direct" and "collateral" consequences of a guilty plea and held that the effective assistance of counsel requires a defendant's attorney to inform him of the former but not of the latter. See *Hughes*, 2012 IL 112817, ¶ 45; *People v. Huante*, 143 Ill. 2d 61, 71-72 (1991). Our courts defined direct consequences as those that are definite, immediate, and largely automatic in their effect upon a defendant's punishment. *People v. Williams*, 188 Ill. 2d 365, 372 (1999). Collateral consequences are those that are not related to the length or nature of the sentence imposed on the

2015 IL App (2d) 130451

basis of the plea. *Id.* Collateral consequences generally result from actions taken by agencies that the trial court does not control. *Id.*

¶ 75    In *Frison*, a pre-*Padilla* case, this court held that the availability of day-for-day good-conduct credit under section 3-6-3(a) of the Code is a collateral consequence of a guilty plea and that a defendant's attorney thus is not ineffective merely for failing to inform his client about it. *Frison*, 365 Ill. App. 3d at 936. We explained that a defendant does not automatically receive any such credit, which is contingent on his behavior after he is sentenced. *Id.* at 935. Moreover, we note here that section 3-6-3(a) leaves the decision whether to award or deny a defendant good-conduct credit primarily to the Department of Corrections, and not the trial court.

¶ 76    Defendant contends that, after *Padilla* and our supreme court's decision in *Hughes*, *Frison*'s rigid adherence to the direct/collateral test is no longer tenable. For reasons that we explain, even if defendant is right, it does not help him here.

¶ 77    In *Padilla*, the Supreme Court addressed whether trial counsel can be constitutionally ineffective for failing to advise a defendant that pleading guilty carries the risk of deportation. At the time, Illinois courts (among many others) had long held that, because deportation is a collateral consequence of a guilty plea, trial counsel is not ineffective merely for failing to advise his client about it. See *Padilla*, 559 U.S. at 365 n.9; *Huante*, 143 Ill. 2d at 71.[1] In *Padilla*, the Court noted that it had "never applied a distinction between direct and collateral consequences to define the scope of constitutionally 'reasonable professional assistance' " required under the

---

[1] There is an important qualification, though it is not directly relevant here. Although trial counsel is not ineffective for failing to raise a collateral consequence, counsel can still be ineffective for affirmatively *misleading* the defendant about a collateral consequence. *People v. Correa*, 108 Ill. 2d 541, 551-52 (1985); *People v. Young*, 355 Ill. App. 3d 317, 323 (2005).

sixth amendment. *Padilla*, 559 U.S. at 365 (quoting *Strickland*, 466 U.S. at 689). The Court rejected the application of the distinction in the context of deportation, which is "uniquely difficult to classify as either a direct or a collateral consequence." *Id.* at 366. Thus, the defendant's claim was not barred. The Court analyzed whether trial counsel's performance was objectively unreasonable (see *Strickland*, 466 U.S. at 688) under " 'prevailing professional norms' " (*Padilla*, 559 U.S. at 366 (quoting *Strickland*, 466 U.S. at 688)), concluded that it was, and remanded for a hearing on whether the defendant could satisfy *Strickland*'s prejudice prong. *Id.* at 374-75.

¶ 78    In *Hughes*, our supreme court considered whether *Padilla* called for rejecting the direct/collateral distinction in an area other than deportation. The defendant, who had pleaded guilty to aggravated criminal sexual abuse, contended that his trial counsel had been ineffective for failing to warn him of the possibility that the State would petition to commit him as a sexually violent person. *Hughes*, 2012 IL 112817, ¶ 1. Recognizing that *Padilla* had rejected the rigid application of the direct/collateral distinction in the deportation context, the supreme court did the same for commitment as a sexually violent person, emphasizing that, as with deportation, the "collateral" consequence might be "more severe than the criminal penalty imposed by the court." *Id.* ¶ 52. Thus, the court held, a defendant's attorney has "a minimal duty to advise a defendant who pleads guilty to a triggering offense subject to [commitment as a sexually violent person] that he will be evaluated for and may risk involuntary commitment after completing his prison term." *Id*. ¶ 60.

¶ 79    Deportation and commitment as a sexually violent person are qualitatively different from the availability (or not) of good-conduct credit. Deportation and commitment are independent harms that accrue in addition to the sentence that the trial court has imposed; good-conduct credit

affects only how much of the sentence imposed the defendant actually serves. Extending *Padilla* and *Hughes* to good-conduct credit is anything but a foregone conclusion. Nonetheless, as this case tends to demonstrate, the availability of the credit, although a collateral matter, can be a substantial consideration for a defendant who is offered a plea bargain involving a substantial prison term. Whether the direct/collateral distinction that bound this court in *Frison* still should obtain after *Padilla* and *Hughes* is a fair question.

¶ 80    Only one Illinois opinion after *Padilla* addresses this question. The opinion provides an unequivocal answer to the question, but without addressing the possible impact of *Padilla* and *Hughes*. However, the omission is not crucial, given the later holdings of the Supreme Court.

¶ 81    In *People v. Powers*, 2011 IL App (2d) 090292, a jury convicted the defendant of aggravated criminal sexual assault, and he was sentenced to 25 years' imprisonment. On direct appeal, the judgment was affirmed. The defendant then filed a postconviction petition, which alleged that his trial counsel had been ineffective for incorrectly advising him that, under a plea offer that the defendant later rejected, he would have to serve 85% of a proposed 14-year prison term. *Id.* ¶ 6. According to the defendant, he would have been required to serve only 50% of his term, and he would have accepted the offer had he known that he could receive day-for-day good-conduct credit. *Id.* ¶ 7. The trial court dismissed the postconviction petition.

¶ 82    This court affirmed. We reasoned in part that *Frison* controlled, because "the failure to inform a defendant of a consequence of a guilty plea" can support a claim of ineffectiveness only if the consequence is a direct one of pleading guilty. *Id.* ¶ 9. Our opinion did not discuss whether *Padilla* or *Hughes* might modify the application of the direct/collateral test to the issue of good-conduct credit. This omission was not explained in the opinion itself, and it ignored existing Illinois authority. See *People v. Gutierrez*, 2011 IL App (1st) 093499, ¶ 42 (*Padilla*

should be applied retroactively).[2] However, the omission was later validated. In *Chaidez v. United States*, 568 U.S. ___, ___, 133 S. Ct. 1103, 1113 (2013), the Court held that *Padilla* does not apply retroactively on collateral review. See also *People v. Greco*, 2014 IL App (1st) 112582, ¶ 29.

¶ 83 Although defendant of course does not invoke *Padilla*'s narrow holding—that trial counsel's failure to inform a defendant about the deportation-related consequences of a guilty plea can support a finding of ineffective assistance—he does request the retroactive application of *Padilla*'s disapproval of the rule in Illinois that trial counsel's failure to inform a defendant of a collateral consequence of a guilty plea can never support a claim of ineffectiveness. Thus, defendant asks us to apply a new rule of law to a case in which the direct-appeal process expired decades ago. Indeed, as *Padilla* and *Hughes* do not actually speak to the specific issue here, defendant requests that we *create* and apply a new rule of law to a case on collateral review.

¶ 84 We decline the invitation. We agree with the reasoning of *Frison* insofar as it follows the traditional direct/collateral rule that our supreme court followed strictly until very recently. An examination of the amended section 3-6-3(a) that took effect in 1978 shows that it did indeed make day-for-day good-conduct credit contingent on events outside the control of the trial court at the time of sentencing. Whether a defendant receives credit (and how much) is not settled at

---

[2] Also, *Powers* appears to be unsound even under long-standing Illinois law. In *Powers*, the defendant's attorney did not merely fail to inform him of the good-conduct credit for which he would be eligible if he accepted the State's offer; he affirmatively misled him about how much credit he could receive. Thus, unlike *Frison* (in which the trial attorney merely failed to mention the credit matter), *Powers* appears to fit within *Correa*'s qualification to the direct/collateral rule.

the time of sentencing; when it does become settled later on, that occurs primarily through the actions of agencies other than the trial court. Whatever vitality *Frison* retains in the post-*Padilla* era is an issue for cases to which *Padilla* actually applies, and that category does not include defendant's successive postconviction petition. Defendant's critique of *Frison* is beside the point even if it is valid, a matter that we need not decide.

¶ 85    Because Simpson's allegedly substandard performance in failing to inform defendant of the day-for-day good-conduct credit available under the State's plea offer cannot support a claim of ineffective assistance, defendant's first claim of ineffectiveness did not make a substantial showing of ineffectiveness, and we affirm the trial court's dismissal of it.

¶ 86    We turn to defendant's second claim: that Simpson was ineffective for erroneously telling him that he could not be sentenced to more than 40 years for first-degree murder, because the facts did not allow a finding that his crime was accompanied by exceptionally brutal or heinous conduct (see Ill. Rev. Stat., 1978 Supp., ch. 38, ¶ 1005-8-1(a)(1)). The trial court held that, based on the evidence at the hearing, Simpson offered an erroneous assessment of the evidence, for which he could not be found ineffective.

¶ 87    A defense attorney's honest assessment of a defendant's case cannot be the basis for a finding of ineffectiveness. *People v. Wilson*, 295 Ill. App. 3d 228, 237 (1998); *People v. Bien*, 277 Ill. App. 3d 744, 751 (1996). Here, the trial judge credited Simpson's account of his advice to defendant. Simpson testified that he told defendant that "in [his] *opinion*, what [defendant] did *** did not qualify as brutal and heinous"; that he advised defendant that (as defendant's attorney phrased it on redirect examination), he "did not *believe* that the evidence or the facts would permit a Judge to find [the crime] exceptionally brutal and heinous"; that he told

- 32 -

defendant that "[he] did not *consider* it a brutal and heinous crime"; and that he "explained to [defendant], in [his] *opinion*, it was not a brutal and heinous crime." (Emphases added.)

¶ 88 Defendant's testimony tended to paint Simpson's expression of his opinion as a dogmatic one, free of doubt. Even defendant, however, did not provide any basis to find that Simpson misunderstood the law or failed to take all the pertinent facts into account. Of course, insofar as the two witnesses' testimony conflicted, it was the judge's prerogative to credit Simpson over defendant and to draw reasonable inferences that did not favor defendant's theory of the case.

¶ 89 The judge concluded that Simpson had not based his statements to defendant on any mistakes of law but had provided "factual advice," a prediction that turned out to be wrong. We cannot say that this conclusion was manifestly erroneous.

¶ 90 That is not to say that Simpson's assessment of the case was flawless; even without the benefit of hindsight, it might have been unwise to speak as confidently as he did (or allegedly did) about the application of the open-ended terminology of a brand-new statute to the facts of defendant's case, facts that surely cut both ways. But that complexity also supports the conclusion that Simpson's opinion was not so unreasonable as to overcome the strong presumption that his performance was reasonable. After all, on defendant's direct appeal, this very court agreed with Simpson that the State had not proved the "brutal or heinous" factor. Although the supreme court disagreed with us, the point is that Simpson's opinion was neither based on any error of law or fact nor an unreasonable "judgment call" based on the law and facts.

¶ 91 Defendant relies on *Julian v. Bartley*, 495 F.3d 487 (7th Cir. 2007), which he asserts is analogous to this case. We find *Julian* distinguishable. There, the defendant was offered a bargain under which he would plead guilty to two separately charged armed robberies and receive concurrent 23-year prison terms. At the time, the defendant was on supervised release

for a prior armed-robbery conviction. His attorney told him that, under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), he could not receive more than 30 years total, because the prior conviction, which was not mentioned in the indictments, could not be considered to enhance the sentence unless it were submitted to a jury and proved beyond a reasonable doubt. The defendant rejected the plea offer and went to trial. He was convicted of both counts and sentenced to concurrent 40-year prison terms. *Julian*, 495 F.3d at 489-90.

¶ 92    The federal appellate court held that the defendant's trial attorney had been ineffective for advising him erroneously about the possible impact of *Apprendi*. The key was that the attorney had grossly misread *Apprendi*. Although *Apprendi* did hold that any fact that increases the penalty for a crime beyond the statutory maximum must be submitted to a jury and proved beyond a reasonable doubt, the Supreme Court's opinion "specifically exempted from this holding the fact of a prior conviction." *Id.* at 490. This holding "is clear on first, second, or third glance." *Id.* at 497. Thus, the attorney's advice "was clearly wrong and therefore objectively unreasonable." *Id.* at 495.

¶ 93    The situation here is not analogous to that in *Julian* (which, of course, does not bind this court in any event). Here, Simpson did not make a gross mistake of law—or, indeed, any mistake of law. He did not misread the statute (or the case law interpreting the statute, of which there was none). Instead, he provided an opinion, if ultimately an overconfident one, that the specific facts of defendant's case did not demonstrate exceptionally brutal or heinous conduct indicative of wanton cruelty. *Julian* does not persuade us that the trial court erred in denying defendant's surviving claim of ineffective assistance of trial counsel.

¶ 94    For the foregoing reasons, the judgment of the circuit court of Du Page County is affirmed.

¶ 95    Affirmed.