2021 IL App (1st) 180815-U

FIFTH DIVISION
March 31, 2021

No. 1-18-0815

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of Cook County |
| | ) | |
| Respondent-Appellee, | ) | |
| | ) | |
| v. | ) | No. 14 CR 5013 |
| | ) | |
| AUGUESTE BURTON, | ) | |
| | ) | Honorable Angela Munari Petrone, |
| Petitioner-Appellant. | ) | Judge, presiding. |
| | ) | |

PRESIDING JUSTICE DELORT delivered the judgment of the court.
Justices Cunningham and Rochford concurred in the judgment.

**ORDER**

¶ 1    *Held:* We affirm in part and reverse in part the circuit court's dismissal of petitioner's postconviction petition at the second stage of proceedings. Petitioner failed to make a substantial showing that he received ineffective assistance of counsel at trial, but he did make a substantial showing that he received ineffective assistance of plea counsel.

¶ 2    Following a jury trial, petitioner Augueste[1] Burton was convicted of attempt murder of a peace officer, attempt murder while armed with a firearm, and aggravated discharge of a firearm.

---

[1] In our order on direct appeal, we spelled petitioner's given name "Auguste." *People v. Burton*, 2012 IL App (1st) 103007-U. Although that spelling also appears occasionally throughout the record before us, the record includes several instances of petitioner's signature, in which he spells his name "Augueste". We adopt that spelling.

Petitioner was sentenced to concurrent prison terms of 52 years, 35 years, and 20 years for the respective convictions. On direct appeal, this court affirmed petitioner's attempt murder convictions and sentences, but vacated the aggravated discharge conviction. *People v. Burton*, 2012 IL App (1st) 103007-U, ¶ 70. Petitioner then filed a postconviction petition alleging that his trial counsel had rendered ineffective assistance. The circuit court dismissed the petition at the second stage of proceedings. We affirm in part, reverse in part, and remand with instructions.

¶ 3                                          BACKGROUND

¶ 4       The facts of petitioner's trial are fully set forth in this court's decision on direct appeal. *Id.* ¶¶ 4-19. We recite only those facts that are relevant to this appeal.

¶ 5       During her opening statement, petitioner's counsel told the jury:

"There was no physical evidence that Augueste Burton ever touched that gun. You're not going to hear about fingerprints. And, in fact, what you are going to hear is that after Augueste Burton was arrested that evening, Chicago police officers administered a gunshot residue testing kit to his hands to see if Mr. Burton had gunshot residue on his hands. *** [T]hat kit was then sent to the Illinois State Police Crime Lab for testing. Mr. Burton had no gunshot residue on his hands that night, which would indicate that he did not fire a firearm."

¶ 6       The State's first witness was Officer Alfonza Wysinger of the Chicago Police Department. Wysinger testified that, at about 8 p.m. on the evening in question, he was with his brother on the front porch of his grandmother's house. He was dressed in street clothes, and because it was the height of summer, it was still light out at that hour. He observed two Black men walk past the house and around the corner. He then saw one of the men, whom he identified in court as petitioner, walking back the way he had come. Wysinger then saw petitioner stop in

the middle of an intersection, raise a revolver, and fire several rounds at an unknown target. Wysinger then heard a barrage of return gunfire, although he could not see where the shots were coming from. Petitioner then turned, crouched down, and ran away.

¶ 7     Wysinger chased petitioner on foot while repeatedly shouting, "[p]olice, stop, drop the weapon, police[,] stop, drop the weapon." At one point, petitioner paused, turned in the direction of Wysinger, pointed his gun at him, and fired a single shot. Wysinger returned fire with his service weapon but missed. The chase continued and petitioner once again fired the gun at Wysinger, this time from about 15 to 20 feet away. At one point, petitioner and Wysinger both tripped and fell to the ground. Wysinger eventually caught up to petitioner, tackled him, and held him until uniformed police arrived. Wysinger observed that petitioner no longer had the gun when he was apprehended.

¶ 8     Four additional eyewitnesses testified that they saw portions of the chase and identified petitioner in open court. Of those witnesses, three testified to seeing petitioner fire a gun at Wysinger. Two of the witnesses saw petitioner throw down the gun during the chase, and both testified that they then stood by the discarded gun until it could be collected by the police.

¶ 9     Forensic Investigator Jill Kolssak testified that she recovered several spent cartridge casings and bullet fragments from the crime scene. She also recovered the revolver that the witnesses had seen petitioner throw on the ground. Each of the six chambers of the revolver contained a spent casing. Kolssak also inventoried Wysinger's semi-automatic handgun and magazine at the scene.

¶ 10    Kolssak sent the recovered evidence to the Illinois State Police Crime Lab for testing. After processing the crime scene, Kolssak and her partner inventoried petitioner's clothes and

performed a gun shot residue (GSR) test on his hands. Crucially for our present purpose, Kolssak did not testify about the results of the GSR test.

¶ 11    Forensic Scientist Melissa Nally testified that she inspected the recovered revolver as well as Wysinger's semi-automatic service weapon. She determined that the spent casings found in the revolver were fired by the revolver and that two recovered bullet fragments from the scene had been fired from the revolver. Nally also determined that three recovered casings were fired by Wysinger's gun. Nine other cartridge casings found at the scene were fired from an unrecovered gun and one was fired from a different, unrecovered gun.

¶ 12    Detective James Gilger testified that he responded to the crime scene. He testified that he did not request fingerprint analysis on the recovered revolver because it was already established that petitioner had dropped it. Gilger explained that evidence is usually sent for fingerprinting when the offender is unknown or has fled the scene. He also testified that a GSR test was performed on petitioner about 3½ hours after the shooting, but he did not testify as to the results of that test.

¶ 13    The State then rested. Outside of the presence of the jury, defense counsel requested that the case be continued until the following Monday, at which time she would call a GSR expert. The State informed the court that "cross-examination [of the expert] is going to be based on the fact that there's numerous ways" that the residue could have been wiped off petitioner's hands. On the next court date, defense counsel informed the court that petitioner intended to rest without putting on any evidence. The court asked, "Why didn't we do that Friday?" Defense counsel responded, "There are reasons."

¶ 14    In her closing argument, defense counsel argued, "gunshot residue results were never introduced by the prosecution into evidence. Don't you think that if Augueste tested positive for

gunshot residue the prosecution would have introduced those gunshot residue results?" She went on to say, "don't you think that it's circumstantial evidence that you heard that Mr. Burton was administered the gunshot test but you never heard the results of that test? *** Augueste never shot at [Wysinger], he never fired that gun. There is no science to back up what they're saying."

¶ 15 The jury found petitioner guilty of two counts of attempt murder and one count of aggravated discharge of a firearm. In allocution, petitioner professed his innocence and asserted that he had been denied a fair trial because, among other things, the jury never saw the GSR evidence. The court sentenced him to concurrent terms of 52 years, 35 years, and 20 years. In declining to enter a sentence closer to the statutory minimum, the court stated that a minimum sentence "would make light of the charges the [petitioner] was convicted of."

¶ 16 On direct appeal, petitioner argued that: (1) the State failed to prove beyond a reasonable doubt that he knew or should have known that Wysinger was a police officer; (2) trial counsel rendered ineffective assistance by failing to request a jury instruction on imperfect self-defense; (3) the trial court erred by failing to conduct a *Krankel* inquiry; (4) petitioner's sentence was excessive, and 5) his multiple convictions violated the one-act, one-crime doctrine. This court vacated the conviction for aggravated discharge of a firearm, but otherwise affirmed. *Burton*, 2012 IL App (1st) 103007-U, ¶ 70.

¶ 17 In 2014, petitioner filed a *pro se* petition under the Post-Conviction Hearing Act (the Act) (725 ILCS 5/122-1 *et seq.* (West 2012)). The petition argued, among other things, that petitioner's trial counsel had rendered ineffective assistance by failing to introduce evidence that the GSR test came back negative. Petitioner attached two Illinois State Police Laboratory Reports, each of which concluded that the test results "indicate that the subject may not have

discharged a firearm." The reports continued, "If the subject did discharge a firearm, then the particles were removed by activity, were not deposited, or were not detected by the procedure."

¶ 18    The Cook County Public Defender's Office was appointed to represent petitioner on August 26, 2014. In February, 2015, petitioner filed a *pro se* motion to supplement his petition. In the motion, petitioner claimed that, before trial, his attorney told him that the State had offered a 20-year sentence if petitioner would plead guilty to a single charge of attempt murder. He alleged that he was prepared to accept that deal, but his attorney "convinced him not to accept the plea [be]cause the prosecutor would be unable to prove its [*sic*] case *** [be]cause the petitioner tested negative for gun shot residue on both hands." Petitioner's postconviction counsel later filed petitioner's affidavit in support of his motion to supplement his petitioner.

¶ 19    On July 1, 2016, the State filed a motion to dismiss the petition, and on March 16, 2018, the circuit court granted the State's motion. This appeal followed.

¶ 20                                    ANALYSIS

¶ 21    Petitioner argues that the circuit court erred in dismissing his postconviction petition at the second stage of proceedings. He requests that we reverse the circuit court's dismissal of his postconviction petition and remand the case for an evidentiary hearing.

¶ 22                                    Forfeiture

¶ 23    Before we reach the merits of this appeal, we must address the State's contention that each of petitioner's claims of ineffective assistance has been forfeited. Postconviction proceedings are limited " 'to constitutional matters which have not been, and could not have been, previously adjudicated.' " *People v. Scott*, 194 Ill. 2d 268, 273-74 (2000) (quoting *People v. Winsett*, 153 Ill. 2d 335, 346 (1992)). Accordingly, issues that could have been raised on direct appeal, but were not, are considered forfeited and, therefore, barred from consideration in a

postconviction proceeding. *People v. Blair*, 215 Ill.2d 427, 443-44 (2005). The forfeiture rule applies only where it was possible to raise an issue on direct appeal; thus, a postconviction claim that depends on matters outside the record is not ordinarily forfeited, because matters outside the record may not be raised on direct appeal. See *People v. Jones*, 364 Ill. App. 3d 1, 5 (2005).

¶ 24    The State argues that petitioner's contentions regarding the GSR test results are forfeited because the test results were known to trial counsel and therefore could have been raised in petitioner's direct appeal. Petitioner correctly points out, however, that the test results were never made part of the trial record precisely because of the alleged ineffective assistance. As a result, the GSR issues could not have been raised on direct appeal and those contentions are not forfeited.

¶ 25    The State also argues that petitioner's contentions regarding plea bargaining are forfeited. The State points out that the motion to supplement in the record bears no file stamp. Consequently, the State contends that the motion was not actually filed and its contents, therefore, are beyond the scope of this court's review. See *People v. Jones*, 213 Ill. 2d 498, 507 (2004) ("issues not contained in a dismissed postconviction petition cannot be raised for the first time on appeal"). Moreover, the State argues, neither the circuit court itself nor the argument section of the motion to dismiss specifically addressed the plea-bargaining issue. The State contends that these omissions support the theory that the motion to supplement was never filed.

¶ 26    Petitioner points out that even if the motion to supplement was not properly filed initially, postconviction counsel incorporated it as an exhibit in a later filing of record, along with petitioner's affidavit related to the claims raised. Moreover, the State's motion to dismiss specifically requests that the court "dismiss the instant petition for post-conviction relief *and supplemental petition for post-conviction relief*." (Emphasis added.) The fact that the circuit

court did not specifically address the supplement is of no moment because the court did not specifically address *any* issues in its ruling and did not enter a written order. We find that the issues raised in the motion to supplement were properly before the circuit court, and therefore fall within the scope of our review. See *id.*

¶ 27                                    Standard of Review

¶ 28    The Act allows a petitioner to challenge a conviction or sentence for violations of federal or state constitutional rights. *People v. Pendleton*, 223 Ill. 2d 458, 471 (2006). Postconviction proceedings contain three stages. *People v. Tate*, 2012 IL 112214, ¶ 9. At the first stage, the circuit court independently reviews the petition, taking the allegations as true, and determines whether the petition is frivolous or patently without merit. *Id.* A petition may be summarily dismissed as frivolous or patently without merit only if the petition has no arguable basis either in law or in fact. *Id.* If the court does not summarily dismiss the petition, it advances to the second stage, where counsel may be appointed to an indigent petitioner, and where the State may respond to the petition. *Id.* ¶ 10. At this stage, the court determines whether the petition and any accompanying documentation make a substantial showing of a constitutional violation. *Id.* If no such showing is made, the petition is dismissed. Otherwise, the petition is advanced to the third stage for an evidentiary hearing. *Id.*

¶ 29    Here, the petition was dismissed at the second stage. "Dismissal is warranted at the second stage where the defendant's claims, liberally construed in light of the trial record, fail to make a substantial showing of a constitutional violation." *People v. Turner*, 2012 IL App (2d) 100819, ¶ 21. "[A]ll well-pleaded facts that are not positively rebutted by the trial record are to be taken as true," and "the court is prohibited from engaging in any fact finding." (Internal quotation marks omitted.) *People v. Snow*, 2012 IL App (4th) 110415, ¶ 15. "[W]hen a

petitioner's claims are based upon matters outside the record, the [Act] does not intend such claims to be adjudicated on the pleadings." *Id.* We review the circuit court's dismissal of a postconviction petition at the second stage *de novo*. *Pendleton*, 223 Ill. 2d at 473 (2006).

¶ 30    Petitioner contends that he made a substantial showing that his trial counsel rendered ineffective assistance by failing to introduce the results of the GSR test into evidence. He argues that there is a reasonable probability that the outcome of the trial would have been different had the jury seen that evidence. Petitioner also contends that he made a substantial showing that his trial counsel rendered ineffective assistance by advising him not to accept the plea deal offered by the State. He argues that he would have accepted the plea agreement if not for his attorney's unreasonable advice.

¶ 31    Claims of ineffective assistance of counsel are governed by the familiar standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and adopted by the supreme court in *People v. Albanese*, 104 Ill. 2d 504 (1984). *People v. Petrenko*, 237 Ill. 2d 490, 496 (2010). To establish ineffective assistance, a petitioner must show both that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the petitioner. *Id.* Deficient performance is performance that is objectively unreasonable under prevailing professional norms, and prejudice is found where there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 496-97; *Strickland*, 466 U.S. at 690, 694. The failure to establish either prong of the *Strickland* test is fatal to the claim. *People v. Clendenin*, 238 Ill. 2d 302, 317-18 (2010) (citing *Strickland*, 466 U.S. at 697).

¶ 32                                    GSR Evidence

¶ 33    Petitioner argues that his counsel rendered ineffective assistance by not introducing the results of the GSR tests into evidence, even though she had "promised" the jury that they would

see GSR evidence in her opening statement. Moreover, he contends, she asked for a continuance so that she could call a GSR expert, but then "inexplicably" rested without calling the expert. His argument is essentially two-fold; (1) by promising the jury that it would hear GSR evidence, but failing to deliver on that promise, the credibility of the defense was irreparably compromised, and (2) the failure to present the exculpatory GSR evidence could not have been the result of competent trial strategy.

¶ 34 Matters of trial strategy are generally immune from claims of ineffective assistance of counsel. *People v. West*, 187 Ill. 2d 418, 432-33 (1999). In other words, the effective assistance of counsel merely refers to "competent, not perfect," representation. *People v. Stewart*, 104 Ill. 2d 463, 491-92 (1984). Thus, mistakes in trial strategy, tactics, or judgment will not "of themselves" render a trial counsel's representation constitutionally defective. *Id*. For these reasons, we must be highly deferential to trial counsel as to trial strategy, and we must evaluate counsel's performance from his perspective at the time and not "through the lens of hindsight." *Id*. A defendant bears the burden of overcoming the strong presumption that his counsel's decision was the product of sound trial strategy. *People v. Gacy*, 125 Ill. 2d 117, 126 (1988).

¶ 35 Generally, whether to call a particular witness is a matter of trial strategy (*People v. Flores*, 128 Ill. 2d 66, 85-86 (1989)), and strategic choices made after thorough investigation of law and facts relevant to plausible options are "virtually unchallengeable" (*Strickland*, 466 U.S. at 690). A defense attorney may choose not to call a witness who could be subject to severe impeachment (*People v. Smado*, 322 Ill. App. 3d 329, 335 (2001)), or if he reasonably believes that under the circumstances the individual's testimony would likely have been harmful to the defendant (*Flores*, 128 Ill. 2d at 106).Promising the jury that it will hear specific evidence, but

then failing to introduce that evidence may be the basis for a claim of ineffective assistance. *People v. Briones*, 352 Ill. App. 3d 913, 918 (2004).

¶ 36    In his brief, petitioner overstates trial counsel's "promise" and relies on distinguishable cases. In *Briones*, trial counsel said in her opening statement, "[the defendant is] going to get up here on this witness stand and he's going to testify and he's going to tell you the truth and he's going to subject himself to rigorous cross-examination by the State and he's going to do that because he's going to tell you the truth." *Id.* at 915. Ultimately, however, the defendant did not testify, and this court held that trial counsel "set the defense up to be discredited by promising the jury that the defendant would testify to the truth and, inexplicably, failing to call him." *Id.* at 918.

¶ 37    Petitioner also relies on *Harris v. Reed* (894 F.2d 871 (7th Cir. 1990)) in support of this theory. In that case, trial counsel told the jury in her opening statement that a previous suspect "would figure quite prominently in the trial" and that "they would hear evidence supporting an account of the shooting different from that offered by the prosecution." *Id.* at 873. However, the defense rested without presenting any evidence. *Id.* at 877. In holding that trial counsel's performance was deficient, the *Harris* court pointed out that "[w]hen counsel failed to produce the witnesses to support [her] version [of events], the jury likely concluded that counsel could not live up the claims made in the opening." *Id.* at 879.

¶ 38    *Briones* and *Harris* are distinguishable from this case. In those cases, the attorneys made very specific promises about evidence that the defenses would introduce and then left the juries cold, with no explanation for not following through. In this case, however, trial counsel told the jury, "Chicago police officers administered a gunshot residue testing kit to his hands to see if Mr. Burton had gunshot residue on his hands. *** [T]hat kit was then sent to the Illinois State Police

Crime Lab for testing. Mr. Burton had no gunshot residue on his hands that night, which would indicate that he did not fire a firearm." The evidence at trial *did* show that the GSR test was administered and sent to the crime lab, and counsel clearly and compellingly argued to the jury in closing that the test *must* have been negative, or the State would have presented the results. This case simply does not present the "broken promise" scenario contemplated in *Briones* and *Harris*.

¶ 39    Moreover, the decision not to present the GSR test results was the product of a reasonable, if unsuccessful, trial strategy. As noted above, matters of trial strategy are generally immune from claims of ineffective assistance of counsel. *West*, 187 Ill. 2d at 432-33. Petitioner contends that there is no strategic reason not to have presented the negative GSR test results to the jury. However, the State points out that the test results themselves include a disclaimer that "[i]f the subject did discharge a firearm, then the particles were removed by activity, were not deposited, or were not detected by the procedure." Had trial counsel introduced the test results through an expert, the expert would have been subject to cross-examination on this very issue. In fact, shortly after trial counsel requested a continuance so that she could call a GSR expert, the State informed the court that it was prepared to cross-examine the expert on the "numerous ways" that the GSR could have been wiped from petitioner's hands before the test was administered. By not presenting an expert or the GSR test results, trial counsel was able to clearly convey to the jury that the GSR test results were negative without allowing the State to undermine the strength of the test results in cross-examination. Because trial counsel's strategic decision was not unreasonable, petitioner's claim fails to satisfy the first prong of *Strickland* analysis.

¶ 40 Even if trial counsel's decision not to present the GSR test results to the jury had been objectively unreasonable under prevailing professional norms, petitioner cannot show that he was prejudiced. As discussed above, trial counsel left the jury with an unqualified inference that the GSR tests came back negative, so the actual reports would have added very little to petitioner's case. In fact, the impression on the jury may have been stronger without the test results before it, because the State was denied the opportunity to undermine and qualify the negative test results.

¶ 41 Moreover, the evidence presented by the State was overwhelming. Five eyewitnesses testified that they saw some or all of the relevant events. Besides Wysinger himself, three witnesses testified to seeing petitioner fire a gun at Wysinger. Two of those witnesses saw petitioner throw down the gun, and both then stood by the discarded gun until it could be collected by the police. Forensic evidence revealed that the gun that petitioner threw down held six spent casings, and two bullet fragments from the scene were determined to have been fired from that gun. In light of all this evidence, we cannot say that the introduction of the negative GSR test results—rather than the clear and unqualified inference of their existence—could have changed the result of the trial. Petitioner therefore has failed to show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Petrenko*, 237 Ill. 2d at 496-97.

¶ 42                                    Plea Bargaining

¶ 43 Petitioner also alleges that his attorney rendered ineffective assistance by convincing him to turn down a possible 20-year sentence for a guilty plea. He claims that his counsel convinced him that, considering the negative GSR test results, the State would be unable to prove its case. Petitioner contends (1) that such advice was unreasonable, and (2) that he was prejudiced by the

advice because he otherwise would have accepted the plea deal and received a much lighter sentence than he ultimately received.

¶ 44    A defendant has a constitutional right to the effective assistance of counsel in plea negotiations with the State. *People v. Hale*, 2013 IL 113140, ¶ 16. "This right to effective assistance of counsel extends to the decision to reject a plea offer, even if the defendant subsequently receives a fair trial." *Id.* Whether to accept or reject a plea offer is a decision only the defendant can make. *People v. Blommaert*, 237 Ill. App. 3d 811, 816 (1992). For this decision to be knowing and voluntary, defense counsel must fully inform himself of the facts and the law relevant to the State's offer and candidly advise his client as to the direct consequences of accepting or rejecting the offer. *Id.* at 817.

¶ 45    As discussed above, we apply the *Strickland* standard to such claims. See *Hale*, 2013 IL 113140, ¶ 15. To satisfy the second *Strickland* prong, a petitioner must not only "establish that there is a reasonable probability that, absent his attorney's deficient advice, he would have accepted the plea offer," he "must also demonstrate a reasonable probability that the plea would have been entered without the prosecution canceling it or the trial court refusing to accept it" *Id.*, ¶¶ 18-19 (quoting *Missouri v. Frye*, 566 U.S. 134, 147 (2012)). That showing must rely on "independent, objective confirmation that defendant's rejection of the proffered plea was based upon counsel's erroneous advice," rather than other considerations. *Id.*, ¶ 18 (quoting *People v. Curry*, 178 Ill. 2d 509, 532 (1997)).

¶ 46    It bears repeating that the circuit court was to take all well-pleaded facts not positively rebutted by the record as true, and that claims related to matters outside the trial record should generally not be resolved on the pleadings. *Snow*, 2012 IL App (4th) 110415, ¶ 15. A trial record

is typically silent "as to what a defendant was told about rejecting or accepting a guilty-plea offer from the State." *People v. Williams*, 2016 IL App (4th) 140502, ¶ 33.

¶ 47     As to the first *Strickland* prong, petitioner alleged that plea counsel "convinced him not to accept the plea [be]cause the prosecutor would be unable to prove its [*sic*] case *** [be]cause the petitioner tested negative for gun shot residue on both hands." In his supporting affidavit, petitioner alleged that plea counsel "advise[d]" him that "the A.S.A. wouldn't be able to prove its case beyond a reasonable doubt due to the G.S.R. results."

¶ 48     Initially, the State contends that petitioner's description of his counsel's statements as "advice" is a tacit admission that counsel was merely offering a reasonable professional opinion. Attorneys in both criminal and civil matters are constantly giving advice. Occasionally, that advice is objectively unreasonable under prevailing professional norms. As such, we reject the State's contention that petitioner has pleaded himself out of court by using the word "advice."

¶ 49     Relying primarily on *People v. La Pointe*, 2015 IL App (2d) 130451, the State argues that plea counsel's advice was merely an honest, though erroneous, assessment of the evidence. In *La Pointe*, plea counsel advised the defendant that "[he] did not believe the evidence or the facts would permit a Judge to find [the charged crime] exceptionally brutal and heinous." *Id.*, ¶ 55. Based on this assessment, the defendant chose not to accept a plea agreement. *Id.*, ¶ 36. After trial, the defendant was given an extended sentence based on a finding that the evidence showed "exceptionally brutal or heinous behavior indicative of wanton cruelty." *Id.*, ¶ 20. After a third-stage hearing on the defendant's subsequent postconviction petition, the trial court found that plea counsel had given "a factual piece of advice" rather than making a mistake of law. *Id.*, ¶ 65.

¶ 50     As defendant points out, *La Pointe* deals with the denial of a postconviction petition *after* an evidentiary hearing. *Id.*, ¶ 48. It was from a fully developed record, therefore, that the *La*

*Pointe* court was able to determine that the defendant's plea counsel had made an honest assessment of the evidence rather than a mistake of law. *Id.*, ¶ 89. Indeed, the *La Pointe* court pointed out that it was the trial court's prerogative to weigh the respective testimony of the defendant and the attorney. *Id.* In this case, the trial record contains virtually no discussion of the plea bargaining and certainly nothing to positively rebut petitioner's allegation that his attorney made the unqualified statement that the negative GSR test results precluded conviction. Whether that statement was an honest assessment of the evidence or a mistake of law is a factual question that cannot be resolved on the record before us. Petitioner's unrebutted, well-pleaded allegation therefore satisfies the first prong of *Strickland*.

¶ 51    As to the second prong, petitioner alleges that, but for his attorney's advice, he would have accepted the plea deal. Moreover, had he accepted the plea agreement, he would have received a prison sentence well under half the duration of the sentence that he ultimately received.

¶ 52    The State argues that the record positively rebuts petitioner's claim that he would have accepted the offered plea but for his attorney's advice. The State points to pre-trial statements by the circuit court that petitioner "wanted to go to trial." and to petitioner's own statements in allocution, in which he professed his innocence. The State also contends that the record positively rebuts petitioner's claim that the court would probably have accepted his plea. In sentencing, the court stated that a minimum sentence "would make light of the charges the [petitioner] was convicted of."

¶ 53    Petitioner argues that his professions of innocence are not dispositive because, as our supreme court has observed, various considerations may induce an innocent defendant to enter a guilty plea. See *People v. Reed*, 2020 IL 124940, ¶ 33 (discussing the cost-benefit analysis that

16

may lead innocent defendants to plead guilty). He also argues that the court's statements at sentencing were made after the court had seen the presentation of the State's evidence, and therefore do not bear on whether the court would have accepted a plea *before* trial. Additionally, he points out that his concurrent 52-year and 35-year prison sentences are dramatically disparate from the offered 20-year sentence, a fact which may support his claim. See *Hale*, 2013 IL 113140, ¶ 18.

¶ 54    Petitioner's most compelling argument is that the authorities cited by the State are all procedurally dissimilar from this case. In *Hale*, for example, our supreme court's ruling came after a *Krankel* hearing in which both the defendant and his counsel testified. *Id.*, ¶ 28. In *La Pointe*, on which the State also relies, this court's decision came after a third-stage evidentiary hearing. *La Pointe*, 2015 IL App (2d) 130451, ¶ 48.

¶ 55    A more analogous case is *People v. Williams*. In that case, the trial court dismissed a postconviction petition at the second stage, finding that the petitioner had failed to demonstrate that his plea counsel's advice was unreasonable or how the allegedly unreasonable advice prejudiced him. *Williams*, 2016 IL App (4th) 140502, ¶ 8. After recounting the history of our supreme court's jurisprudence on allegations of ineffective assistance of plea counsel, (see *id.* ¶¶ 18-34,) the *Williams* court reversed the dismissal of the petition and remanded for an evidentiary hearing. *Id.* ¶ 44. "[P]ostconviction challenges based on a claim that the defendant was denied his constitutional right to the effective assistance of counsel during guilty-plea negotiations with the State are almost always based on matters that occur *de hors* the record," observed the *Williams* court. *Id.* Without a developed record, and "[w]hen [petitioner's] well-pleaded facts allege a substantial constitutional violation—as in this case—the court must

advance the postconviction petition to the third stage of postconviction proceedings for an evidentiary hearing." *Id.*

¶ 56    As was the case in *Williams*, petitioner here alleged that he received unreasonable advice which led him to reject a proposed plea bargain. Likewise, the records in both this case and *Williams* lack any indications—one way or the other—about the court's disposition to accept the offer, the State's inclination to rescind the offer, or counsel's advice to plaintiff about the offer. All that we have before us is petitioner's well-pleaded allegations that counsel unreasonably advised him that "the prosecutor would be unable to prove its [*sic*] case," and that, but for his counsel's ineffective assistance, he would have accepted a plea deal for well under half the total prison time than he ultimately received. Those allegations are not positively rebutted by the record. Because the circuit court was required to accept those allegations as true, it was error to dismiss the petition without an evidentiary hearing. See *id.*

¶ 57                                    CONCLUSION

¶ 58    We affirm the dismissal of petitioner's claim with respect to trial counsel's decision not to introduce GSR evidence. We reverse the dismissal of petitioner's claim of ineffective assistance of plea counsel and remand with directions that, pursuant to section 122-6 of the Act (725 ILCS 5/122-6 (West 2018)), the court conduct a third-stage evidentiary hearing on that claim only.

¶ 59    Affirmed in part, reversed in part, remanded with instructions.